UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| MARVETTE ATKINS, Administrator and Personal Representative for the Estate of Daniel Newton Neal, <br><br> Plaintiff, <br><br> v. <br><br> J.G. BENNETT, individually, and T.K. WATERS, Sheriff, City of Jacksonville, Florida, in his official capacity, <br><br> Defendants. | CIVIL ACTION <br> NO. 3:23-00187-WGY-SJH |

YOUNG, D.J.[1]                                  July 11, 2025

## MEMORANDUM AND ORDER

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Marvette Atkins ("Atkins"), as Administrator and Personal Representative for the Estate of Daniel Newton Neal ("Neal"), filed suit against J.G. Bennett ("Bennett"), an officer employed by the Jacksonville, Florida Sheriff's Office, individually, and T.K. Waters ("Waters"), Sheriff of the City of Jacksonville, in his official capacity, on February 20, 2023, Compl., ECF No. 1, then filed the operative Second Amended Complaint on August 16, 2024, 2d Am. Compl. ("SAC"), ECF No. 46.  Atkins brought two counts, based on Bennett's alleged actions in connection with the death of Neal: (1) against Waters, wrongful death in

---

[1] Of the District of Massachusetts, sitting by designation.

violation of Florida Statutes §§ 768.16-768.26, SAC ¶¶ 39-47;
and (2) against Bennett, a Fourth Amendment excessive force
violation, brought pursuant to 42 U.S.C. § 1983, id. ¶¶ 48-53.

Bennett and Waters moved for summary judgment on both
counts. Bennett's Mot. Summ. J. ("Def. Bennett's Mem.") 12-25,
ECF No. 51; Def. Waters' Mot. Summ. J. ("Def. Waters' Mem.") 7-
12, ECF No. 52. The parties have fully briefed these motions.
Pl.'s Opp'n Def. Bennett's Mot. Summ. J. ("Pl.'s Opp'n
Bennett"), ECF No. 59; Pl.'s Opp'n Def. Sheriff's Mot. Summ. J.
("Pl.'s Opp'n Waters"), ECF No. 60; Def. Bennett's Reply Pl.'s
Opp'n Mot. Summ. J. ("Def. Bennett's Reply"), ECF No. 62; Def.
Waters' Reply Pl.'s Opp'n Mot. Summ. J. ("Def. Waters' Reply"),
ECF No. 63.

The Court held a hearing on these motions on March 11,
2025, then took the matter under advisement. Minute Entry, ECF
No. 75. Bennett filed a post-hearing brief in support of his
motion. Def. Bennett's Post-Hr'g Br. Supp. Mot. Summ. J. ("Def.
Bennett's Post-Hr'g Br."), ECF No. 76.

This Court has subject matter jurisdiction over the claim
arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331, and
may exercise supplemental jurisdiction over Atkins' state law
claim because it arises from the same common nucleus of
operative fact as the claim arising under federal law, pursuant
to 28 U.S.C. § 1367.

[2]

## II. FACTUAL BACKGROUND[2]

Neal was a Florida citizen, and his mother, Marvette Atkins, is a resident of Jacksonville, Florida. SAC ¶¶ 1-2. Waters is the Sheriff of Jacksonville, and Bennett was an officer employed by the Jacksonville Sheriff's Office. Id. ¶¶ 3-4. Atkins brings this action as Neal's personal and legal representative and on behalf of his heirs. Id. ¶ 5.

On February 21, 2021, Neal crossed Toledo Road in Jacksonville and entered an apartment complex at 3770 Toledo Road. Id. ¶ 8. Approximately thirty minutes later, he crossed the road again and headed toward a nearby complex at 7061 Old Kings Road S, on the steps of which this incident occurred. Id. ¶¶ 9-10, 23-24.

On that same day, Jacksonville Sheriff's Office officers, including Bennett, held a pre-deployment meeting concerning surveillance and suspects at 7061 Old Kings Road S. Id. ¶ 18. An officer on observation duty later radioed the deployment team about an unidentified suspect's movements, and an officer who was monitoring surveillance cameras at the 7061 Old Kings Road S complex alerted Bennett that the suspect was headed toward

---

[2] The facts recited here are not in dispute. As noted below, the only factual dispute relevant to these motions is over what Neal was doing in the moments before he was shot.

Bennett's location, near the complex's community mail center. Id. ¶¶ 19-20.[3]

Bennett pursued the suspect, later identified as Neal, in the early morning hours. Id. ¶ 22. Neal was shot by Bennett and fell to the ground, then was handcuffed on the ground near his apartment building. Id. ¶¶ 28-29.[4] He was then transported to Memorial Hospital in Jacksonville, where he remained until he died from his injuries on February 22, 2021. Id. ¶ 30.

The key legal issue is whether Bennett had justification for using deadly force against Neal. See Pl.'s Opp'n Bennett 1-10. Atkins alleges that Bennett shot Neal "without justification or provocation, . . . including toward the back of Neal's head," and that, when Neal was shot, he was at the entrance door of the complex's Building 11, which he was facing and attempting to enter because it was his residence, and that he was not pointing a weapon toward Bennett at the time. SAC ¶¶ 22-26. Bennett appears to concede that he did not warn Neal of

---

[3] Bennett specifies that this was an armed robbery suspect, Def. Bennett's Mem. 5-6, which Atkins does not contest, except to argue that Bennett's subjective beliefs are not relevant to the core Fourth Amendment issue, Pl.'s Opp'n Bennett 17-18.

[4] Bennett and Waters deny knowledge of Neal's residence, Def. Bennett's Answer ¶ 18, ECF No. 48, but admit that "Neal was handcuffed on the ground near his apartment building" after he was shot, SAC ¶ 29; Def. Bennett's Answer ¶ 29. Because Bennett's Answer is identical to Waters', see Def. Waters' Answer, ECF No. 47, only Bennett's Answer is cited here.

the possible use of deadly force before firing.  See Pl.'s Opp'n
Bennett 15-16; Def. Bennett's Reply 5-6.  It is undisputed that
Neal was shot in the back of the head and in the side of his
chest, see Pl.'s Opp'n Bennett 10, but Bennett points to
evidence suggesting that, because the bullet traveled at least
partly forward through Neal's head, Neal was turned toward
Bennett when he was shot, and to video evidence showing that a
pistol fell from Neal's person to the ground at some point
during the encounter, suggesting that Neal turned a gun toward
Bennett before Bennett fired, Def. Bennett's Mem. 9-12.

Atkins argues that there are genuine disputes of material
fact as to (1) how targeted toward Neal the police surveillance
of the area was, Pl.'s Opp'n Bennett 1-2; (2) Bennett's possible
animus toward the Neals, id. at 2-3; and, relatedly, (3) why
Bennett was listed as the lead operations officer/detective on
the day of the shooting, id. at 4.[5]  As to the shooting itself,
Atkins argues that there are disputes regarding (1) whether and
why Bennett parked in an area other than where he was detailed
to be, in a spot with an allegedly limited view of the area, id.
at 5-6; (2) whether the operation was a true surveillance
operation or a more targeted stakeout, id. at 6-7; (3) whether
the pursuit of Neal conformed with standard police practices,

---

[5] Atkins raises the same factual issues to oppose Waters'
motion.  Pl.'s Opp'n Waters 1-11.

[5]

id. at 7-8; and (4) crucially, whether Neal was raising a weapon

toward Bennett when he was shot, or was merely attempting to

enter the apartment building, id. at 9-10.  On this last issue,

Bennett points to evidence establishing that Neal was holding a

gun and turned at least partly toward Bennett at or around the

time when he was shot, and argues that this was enough for a

reasonable officer to have believed that he was in danger.  Def.

Bennett's Reply 4.  He also argues that, for the same reason and

because his actions were not unlawful under clearly established

law, he is entitled to qualified immunity.  See generally Def.

Bennett's Reply.  The same factual dispute affects Waters'

motion, for the reasons set out below.  See infra section III.B.

### III.    ANALYSIS

Atkins brings one count against Waters and one against

Bennett.  Against Waters, under the heading of a claim for

"Wrongful Death in violation of Florida Statutes §§ 768.16-

768.26," Atkins alleges that Neal "died as a result of a

shooting by Defendant Sheriff's employee," due to Bennett's

"unnecessary and excessive use of force and negligence," and

that Waters is "liable for the tortious actions of [his]

employees," SAC ¶¶ 40-41, 45; that Neal's death was also caused

by "the participation of Defendant Sheriff and other wrongful

acts" of the Sheriff's officers and "[t]he negligent acts and

omissions" of Waters and Bennett, id. ¶¶ 41-42; and that Neal's

[6]

death was caused by Waters' "negligent custom and practice of allowing failure to train [his] employees on the proper use of force," id. ¶ 43.  This is really three counts in one: (1) a vicarious liability claim based on Bennett's tortious conduct; (2) a claim based on Waters' independent acts or omissions, which were allegedly also a proximate cause of Neal's death; and (3) a failure to train claim grounded in negligence.

Against Bennett, Atkins alleges that Bennett unjustifiably used deadly force in violation of the Fourth Amendment, with conduct that was objectively unreasonable and perhaps also willful and malicious.  Id. ¶¶ 49-52.

Atkins' Fourth Amendment claim against Bennett cannot be resolved at this stage because there is a genuine dispute of material fact as to whether Neal presented an immediate threat to Bennett's or others' safety in the moments before he was shot.  Based on the evidence, including Bennett's Body Worn Camera video of the incident, a reasonable factfinder could find that Bennett shot Neal both without warning of the possible use of deadly force and without Neal's posing a direct threat to Bennett or others.  Under prevailing Fourth Amendment precedent, a jury could find that such use of deadly force was not reasonable.  Bennett is therefore not entitled to summary judgment, because on the version of the facts most favorable to

the non-moving party Atkins, Bennett's use of deadly force was unreasonable under the circumstances.

Although the issue is closer, Bennett is also not entitled to qualified immunity on this count. Again, on the version of the facts most favorable to the non-moving party Atkins, Bennett violated clearly established law by shooting a fleeing suspect who did not present a direct threat to himself or others without warning the suspect of the possible use of deadly force. Atkins has carried her burden to show that it was clearly established law at the time of the incident that deadly force may not be used against fleeing suspects without warning unless the suspect presents an immediate threat to the officer's or others' safety, and disputes of material fact remain regarding the nature of the threat that Neal posed to Bennett or others.

Thus, Bennett's motion for summary judgment on count two is denied.

This same factual dispute precludes this Court from granting Waters' summary judgment motion as well. Despite some lack of clarity in Atkins' pleading and argument on this count, Waters can be held vicariously liable for Bennett's intentional tort if Bennett did tortiously kill Neal.[6]  Therefore, regardless

---

[6] As Waters points out, Atkins sues Waters in his official capacity, and such a suit is treated as a suit against the local government entity he represents, here the City of Jacksonville.

[8]

of the several disputes regarding the background and nature of the surveillance operation and the circumstances surrounding the shooting itself, the genuine dispute of material fact over whether Bennett reasonably believed that Neal posed an immediate threat of serious physical harm to Bennett or others also defeats Waters' motion for summary judgment.

Thus, this Court also denies Waters' motion for summary judgment on count one.

### A. Pleading Standard

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment. Id. In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). This Court must also "disregard all

_____

Def. Waters' Mem. 1 n.1; see Owens v. Fulton Cnty., 877 F.2d 947, 951 n.5 (11th Cir. 1989).

evidence favorable to the moving party that the jury is not required to believe." Id. at 151. The moving party bears the initial burden of demonstrating that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Johnson v. Fleet Fin., Inc., 4 F.3d 946, 949 (11th Cir. 1993). If the movant does so, then the nonmovant must set forth specific facts sufficient to establish a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "Even if the district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." Miller v. Harget, 458 F.3d 1251, 1256 (11th Cir. 2006).

**B. Atkins' Wrongful Death Claim Against Waters (Count One)**

Atkins brings, in essence, three counts in one against Waters: (1) a vicarious liability claim based on Bennett's intentional or negligent torts; (2) a claim based on Waters' independent acts or omissions; and (3) a failure to train claim grounded in negligence.

Insofar as this count seeks to hold Waters vicariously liable for Bennett's intentional or negligent torts, the City, which Waters represents here, may be liable for the acts of its

[10]

.

employees on a respondeat superior theory. See Mazzilli v.
Doud, 485 So.2d 477, 478 (Fla. Dist. Ct. App. 1986); Kampstra v.
Pond, No. 6:22-cv-773, 2023 WL 2078248, at *5 (M.D. Fla. Feb.
17, 2023) ("[A] Florida municipality may be 'held liable for an
employee's intentional act(s) as long as the employee is acting
within the course and scope of his employment and the act or
omission is not committed in bad faith, with malicious purpose,
or in a manner exhibiting wanton and willful disregard of the
plaintiff's rights.'" (quoting City of Boynton Beach v. Weiss,
120 So.3d 606, 611 (Fla. 4th DCA 2013))).  Since Atkins has only
alleged actions amounting to an intentional tort on Bennett's
part, the City's potential vicarious liability lies only for
this intentional tort, not negligence.  See Fontanez v.
Lamberti, No. 10-61428, 2011 WL 4499016, at *16 (S.D. Fla. Sept.
27, 2011) ("Without any underlying liability, there can be no
apportionment of that liability . . . ; any percent of zero is
zero.").  "[I]t is not possible to have a cause of action for
'negligent' use of excessive force because there is no such
thing as the 'negligent' commission of an 'intentional' tort,"
and "a suit for a police officer's use of excessive force
necessarily involves the intentional tort of battery." City of
Miami v. Sanders, 672 So.2d 46, 47-48 (Fla. 3d DCA 1996).  "[A]
separate negligence claim based upon a distinct act of
negligence may be brought against a police officer in

conjunction with a claim for excessive use of force," but "the
negligence component must pertain to something other than the
actual application of force." Id. "Plaintiff's allegations . .
. do not form the basis of a separate, negligence claim because
all of the allegations contained in the [complaint] pertain to
the Officer['s] application of force during the course of the
arrest." Whittington v. Town of Surfside, No. 06-CIV-21032,
2007 WL 9702399, at *3 (S.D. Fla. Jan. 3, 2007).

Waters argues that Atkins' vicarious liability claim is
barred by sovereign immunity. See Joint Pre-Trial Statement 7,
ECF No. 68. Under Florida law, the state and its subdivisions
have waived sovereign immunity for tort claims "in the same
manner and to the same extent as a private individual under like
circumstances," Fla. Stat. § 768.28(5)(a), but "[t]he state or
its subdivisions are not liable in tort for the acts or
omissions of an officer, employee, or agent . . . committed in
bad faith or with malicious purpose or in a manner exhibiting
wanton and willful disregard of human rights, safety, or
property," Fla. Stat. § 768.28(9)(a). Waters raised this
defense in his Answer. Def. Waters' Answer 6, ECF No. 16.

Applying Florida sovereign immunity law, Waters may be held
liable for Bennett's intentional tort if it was not maliciously
done. "As for good faith, '[t]he [municipality] is immune as a
matter of law only if the acts are so extreme as to constitute a

[12]

clearly unlawful usurpation of authority the [officer] does not rightfully possess, or if there is not even a pretense of lawful right in the performance of the acts.'" Kampstra, 2023 WL 2078248, at *5 (quoting McGhee v. Volusia Cnty., 679 So.2d 729, 733 (Fla. 1996))). "[A] jury question as to the sheriff['s] . . . liability exists for acts of officers that can be described as abuses of lawful power . . . . [T]he question must be put to the fact-finder whether [the officer] acted in bad faith, with malicious purpose, [or other disregard] . . . ." McGhee, 679 So.2d at 733. Therefore, Waters' motion for summary judgment must be denied to the extent that Bennett may have committed an intentional tort against Neal without bad faith or malice.

Insofar as this count seeks to hold Waters individually liable for his own negligence with respect to the planning or supervision of the surveillance operation or a broader pattern of racial injustice, see SAC ¶¶ 42, 44, 46, this count as written is brought against Waters in his official capacity, and the complaint is in any case devoid of facts to support this claim, see Loar, 2017 WL 7793846, at *6 (dismissing wrongful death action against Sheriff to the extent that it sought to hold him individually liable where complaint did not "state any actions taken by Sheriff . . . in his individual capacity"). There is some suggestion in Atkins' complaint that Waters was responsible for approving what Atkins depicts as a mismanaged

[13]

stakeout operation, and that Waters oversaw at least one pre-
deployment meeting, see SAC ¶¶ 15-16, 18, but these facts are
not clearly linked to Atkins' negligence claim, which refers in
a conclusory way to the Sheriff's "participation" in his
officers' acts and to his own "negligent acts and omissions,"
and to his "custom and practice of permitting [his] employees to
use unnecessary force against citizens like Decedent," which is
in turn tied to a broad pattern of using excessive force against
Black citizens but, again, not to any plausibly pleaded facts
alleged with respect to the incident in question, id. ¶¶ 31-37,
41-42, 47.

Insofar as this count seeks to hold Waters liable for
negligent failure to train, "any action or inaction on the part
of governmental officials or employees relating to the
enforcement of laws or the protection of public safety cannot
give rise to governmental tort liability 'because there has
never been a common law duty of care with respect to these . . .
functions, and the statutory waiver of sovereign immunity did
not create a new duty of care.'" Vaughn v. City of Orlando, No.
6:07-cv-1695, 2009 WL 3241801, at *9 (M.D. Fla. Sept. 29, 2009)
(quoting Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468
So.2d 912, 921 (Fla. 1985)). "Because the City's decisions
concerning the training and briefing of its police officers
relate to the enforcement of laws and protection of the public

[14]

safety, [plaintiffs] cannot sue the City on such matters." Id.
Claims that the city was "negligent in the implementation or
operation of the training program," and not merely "the content
of the program," may survive this defense, Mercado v. City of
Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005), but here Atkins
alleges only that Waters "allow[ed] failure to train [his]
employees on the proper use of force, including the use of
deadly force," SAC ¶ 43, and points only to evidence regarding
whether Bennett was trained on how to conduct a foot pursuit at
all. See Pl.'s Opp'n Waters 16. Waters persuasively argues
that this goes to training content rather than implementation or
operation, and thus Atkins' claim is barred by the rule that the
City is immune from suit on actions involving its discretionary
functions. See Def. Waters' Reply 6; Lewis v. City of St.
Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) ("A city's
decision regarding how to train its officers and what subject
matter to include in the training is clearly an exercise of
governmental discretion regarding fundamental question of policy
and planning.").[7]

_____

[7] As the Eleventh Circuit has pointed out, there is some
imprecision in courts' handling of what is referred to as
Florida's "public duty doctrine," according to which the
government cannot be sued where it does not owe individuals a
specific duty, and the distinct rule that the government cannot
be sued for exercising its discretionary functions due to
sovereign immunity. Lewis, 260 F.3d at 1265-66 (deeming that
district court was in error for relying on public duty doctrine,

Despite Atkins' failure to plead adequately an individual negligence claim or a failure to train claim against Waters, Waters' motion for summary judgment is denied, because the City may be held vicariously liable for Bennett's intentional tort, provided that it was not done maliciously or in bad faith, and, for the reasons set out below, Bennett's motion for summary judgment on Atkins' excessive force claim is denied.[8]

### C. Atkins' Fourth Amendment Excessive Force Claim Against Bennett (Count Two)

Atkins alleges that Bennett used unreasonable deadly force against Neal in violation of the Fourth Amendment. Compl. ¶¶ 48-53. Bennett argues that his use of deadly force was reasonable under the circumstances because Neal was a fleeing armed robbery suspect, and Neal turned toward Bennett and raised

--------------------------------------

but upholding decision based on sovereign immunity for discretionary functions). This issue is not essential here, as courts agree that at least the discretionary functions bar applies to failure to train claims based on the content of training programs. See Vasconez v. Hansell, 871 F. Supp. 2d 1339, 1343 (M.D. Fla. 2012).

[8] Although Atkins' claim against Waters is brought under Florida law and her claim against Bennett is brought under the Fourth Amendment pursuant to 42 U.S.C. § 1983, the two claims are interdependent because "[t]he same analysis for an excessive force claim under the Fourth Amendment applies to a battery claim for excessive force under Florida law: whether the amount of force was reasonable under the circumstances." Stewart v. Adorno, No. 8:19-cv-1309, 2019 WL 13394034, at *5 (M.D. Fla. Nov. 18, 2019). The Eleventh Circuit "has applied the same Fourth Amendment excessive force analysis to a battery claim against an officer under Florida law." Baxter v. Santiago-Miranda, 121 F. 4th 873, 891-92 (11th Cir. 2024).

his firearm in Bennett's direction before he was shot.  Def.
Bennett's Mem. 14-21; Def. Bennett's Post-Hr'g Br. 3.   Atkins
argues that Neal was simply running away from Bennett into his
residence, and that Bennett did not warn Neal before using
deadly force as he is generally required to do.  Pl.'s Opp'n
Bennett 8-10, 13-19.   The parties make substantially the same
arguments with regard to Bennett's claim that he is entitled to
qualified immunity, and also dispute whether clearly established
law at the time made Bennett's actions unlawful.  Def. Bennett's
Mem. 12-25; Pl.'s Opp'n Bennett 13-20.

In Greer v. Ivey, the Eleventh Circuit reversed the
district court's grant of summary judgment for the defendants in
a case where the plaintiff sued for excessive force after police
responded with deadly force to the decedent's allegedly
brandishing a knife.  767 F. App'x 706 (11th Cir. 2019).[9]  The
court of appeals set out the relevant Fourth Amendment standard
at summary judgment in this manner:

> The principal question . . . is whether, viewing
> the facts in the light most favorable to the
> [nonmovant], it was reasonable for [the officers] to
> use deadly force on [the decedent].  Once we have
> "determined the relevant set of facts and drawn all
> inferences in favor of the nonmoving party to the
> extent supportable by the record, the reasonableness

---

[9] "Unpublished decisions in the Eleventh Circuit are not
binding precedent, but may be cited as persuasive authority."
Carver Middle Sch. Gay-Straight All. v. School Bd. of Lake
Cnty., Fla., 249 F. Supp. 3d 1286, 1291 n.8 (M.D. Fla. 2017).

of [the officers'] actions . . . is a pure question of law."

The answer to that question -- under both federal law and Florida law -- **turns on whether, in the moment before the shooting, the deputies reasonably believed that [the decedent] posed an immediate threat to their safety.** The parties disagree over what transpired in that pivotal moment.

As we have previously cautioned, "the mere presence of a . . . weapon is not enough to warrant the exercise of deadly force and shield an officer from suit. Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." Here, the reasonableness determination turns on two questions: Was [the decedent] holding a [weapon] when he was killed? And if so, what was he doing with it?

Id. at 710 (emphasis added) (citations omitted) (first quoting

Scott v. Harris, 550 U.S. 372, 381 n.8 (2007); and then quoting

Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016)).[10]

So here. If Bennett reasonably believed that Neal posed an

immediate threat to his safety when he used deadly force against

him, then his use of force was reasonable even given his failure

to warn Neal, because the Eleventh Circuit has "decline[d] . . .

to fashion an inflexible rule that . . . an officer must always

---

[10] These are only the factors most relevant to the analysis here. The general Fourth Amendment reasonableness test for excessive force claims "requires careful attention to the facts and circumstances of each particular case," including (1) the severity of the crime at issue, (2) the immediateness of the threat posed to the safety of officers or others, and (3) whether the suspect is actively resisting arrest or fleeing. Crenshaw v. Lister, 556 F.3d 1283, 1290 (11th Cir. 2009).

warn his suspect before firing -- particularly where . . . such a warning might easily have cost the officer his life." Penley v. Eslinger, 605 F.3d 843, 854 n.6 (11th Cir. 2010) (quoting Carr v. Tatangelo, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003)). On the other hand, if Bennett used deadly force without warning and without the reasonable belief that Neal posed an immediate threat to his or others' safety, then his use of deadly force was unreasonable, because "deadly force is not justified '[w]here the suspect poses no immediate threat to the officer and no threat to others.'" Perez, 809 F.3d at 1222 (alteration in original) (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)).

Bennett's use of deadly force here was not reasonable beyond genuine dispute of material fact, so Bennett is not entitled to summary judgment on count two. Although the evidence establishes that a firearm fell to the ground next to the stairs where Neal was shot at some point during the encounter between Bennett and Neal, see Def. Bennett's Mem. 8, and although ballistics testing suggests that Neal was turned at least partly toward Bennett when he was shot, the evidence simply does not establish beyond dispute whether Neal was brandishing this firearm when Bennett shot him, see Pl.'s Opp'n

Bennett 8-10.[11]  There is, therefore, a genuine issue of material

fact as to whether Neal posed an immediate threat to Bennett's

safety when he was shot.  "An officer is not required to wait

until an armed and dangerous felon has drawn a bead on the

officer or others before using deadly force," but he must at

least reasonably believe that the fleeing suspect poses an

immediate threat of serious injury to the officer or to others.

St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir.

2002) (quoting Montoute v. Carr, 114 F.3d 181, 183 (11th Cir.

1997)); see also Perez, 809 F.3d at 1222.[12]  Although "less is

---

[11] Bennett argues that his Body Worn Camera video establishes
that Neal's left side was presented to him from an elevated
position when he was shot and that a gun recovered from the
scene first appears on the grass next to the steps where Neal
was shot around when Bennett shoots him, Def. Bennett's Mem. 11-
12, and from this that it has been established that Neal was
moving a gun toward Bennett when he was shot, Def. Bennett's
Post-Hr'g Br. 4-5.  This Court has reviewed Bennett's Body Worn
Camera video, and rules that it is not clear from the video
whether Neal was holding a gun or turning it toward Bennett when
he was shot.  Def. Bennett's Ex. 6.  "[W]hen 'opposing parties
tell two different stories, one of which is blatantly
contradicted by the record, so that no reasonable jury could
believe it,' a court should not adopt the contradicted version
for purposes of ruling on a motion for summary judgment."
Singletary v. Vargas, 804 F.3d 1174, 1183 (11th Cir. 2015)
(quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  The video
of the incident does not blatantly contradict Atkins' account of
the incident, and thus, because a reasonable jury could believe
Atkins' account, this Court must leave this factual issue for a
jury.

[12] Bennett has also raised the issue of the threat Neal may
have posed to the occupants of the apartment building toward
which he was fleeing, see Def. Bennett's Post-Hr'g Br. 6 -- a
building in which Atkins alleges Neal shared an apartment with

[20]

required for an officer to reasonably perceive an immediate threat when the suspect is armed 'with a gun, rather than a knife,'" Greer, 767 F. App'x at 712 (quoting Garczynski v. Bradshaw, 573 F.3d 1158, 1169 n.3 (11th Cir. 2009)), Bennett cites no authority for the proposition that any conjunction of the undisputed circumstances here -- the fleeing suspect, the suspect's being allegedly armed, the suspect's flight toward a residence -- gave him license to use deadly force without warning.[13]

---

his girlfriend, Compl. ¶ 9 -- but Bennett states in his motion for summary judgment that "that is not the reason Bennett shot Neal"; rather, "[h]e did so only when he felt Neal posed an actual and immediate threat to Bennett," Def. Bennett's Mem. 21 n.10.  This is supported by statements in Bennett's deposition. Bennett Dep. 210, ECF 49-10.  Although Fourth Amendment reasonableness is an objective test, Bennett points to no case law supporting the assertion that an officer may shoot a fleeing suspect without warning just because he is fleeing toward a residential building, and this Court rules that it is a dispute of material fact whether Neal posed an immediate danger to others at the time when he was shot.

[13] After the hearing on this motion, a sister district court decided a similar issue -- although on distinguishable facts, involving a protracted vehicle chase and the suspect's committing a felony in the officer's presence -- based on the proposition that "the Eleventh Circuit has confirmed that a reasonable officer is justified in using deadly force to apprehend a fleeing suspect who has access to a firearm," relying on some of the same cases that are analyzed here. Venisee v. Miami-Dade Cnty., 25-cv-20024, 2025 WL 1529683, at *4, *6 (S.D. Fla. May 29, 2025).  For the reasons set out infra regarding the specific facts of the cited cases, this Court has distilled different, clearly established background principles from Eleventh Circuit and Supreme Court case law, namely, that deadly force may not be used against fleeing suspects without warning unless the suspect poses an imminent danger to the

Viewing the facts in the light most favorable to the non-moving party Atkins, it remains plausible that Neal merely glanced back toward Bennett as he attempted to enter the apartment complex, rather than brandishing a gun or pointing it in Neal's direction, and thus that Neal posed no immediate danger to Bennett at the time.  Bennett has therefore not shown beyond dispute of material fact that his use of deadly force without warning against Neal was reasonable.

### 1. Qualified Immunity

Bennett also argues that Atkins has not met her burden of showing that Bennett's actions violated "clearly established" law at the time of the shooting, and so argues that qualified immunity shields him from suit.  Def. Bennett's Reply 6-7. Bennett is correct that the burden shifts to Atkins on this issue.  See Stewart v. Baldwin Cnty. Bd. of Educ., 908 F.2d 1499, 1503 n.1 (11th Cir. 1990) (noting that, once defendants show they were acting within their discretionary authority, "[t]he second step then shifts the burden to the plaintiff to show that the defendants' actions violated clearly established constitutional law").  As set out above, however, precedent clearly establishes that using deadly force against a fleeing suspect without warning, at least when the suspect poses no

_____

officer or to others, and that the mere presence of a weapon is not enough.

[22]

immediate threat of serious harm, constitutes an excessive force

violation.  See Perez, 809 F.3d at 1222.  The "clearly

established" rule poses a high bar, but on balance Atkins has

done enough here, particularly given that the Eleventh Circuit

is one in which "'[e]xact factual identity with a previously

decided case is not required,' but rather, the key inquiry is

whether the law provided the official with 'fair warning' that

his conduct violated the constitution." Young v. Brady, 793 F.

App'x 905, 908 (11th Cir. 2019) (quoting Coffin v. Brandau, 642

F.3d 999, 1013 (11th Cir. 2011)).

     If an official was acting within the scope of his

discretionary authority when he took the challenged actions,

then, "'[t]o overcome qualified immunity, the plaintiff must . .

. show that: (1) the defendant violated a constitutional right,

and (2) this right was clearly established at the time of the

alleged violation.'  'The relevant, dispositive inquiry . . . is

whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted.'" Whittier

v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009) (first

quoting Holloman ex rel. Holloman v. Harland, 370 F.3d 1252,

1264 (11th Cir. 2004); and then quoting Saucier v. Katz, 533

U.S. 194, 202 (2001)).  It is undisputed that Bennett was acting

within the scope of his discretionary authority here, so "the

burden shifts to the plaintiff to show that the official is not

[23]

entitled to qualified immunity," id. (quoting Skop v. City of

Atlanta, 485 F.3d 1130, 1136-37 (11th Cir. 2007)), even while,

at summary judgment, this Court must still "resolve any dispute

in the facts material to the alleged Fourth Amendment violation

in favor of the non-movant," O'Kelley v. Curran, No. 22-10600,

2023 WL 2889246, at *5 (11th Cir. Apr. 11, 2023).  With the

facts viewed in this way, Atkins must show that "existing

precedent . . . placed the statutory or constitutional question

beyond debate," giving the official "fair warning that his

conduct violated the law."  Schantz v. DeLoach, No. 20-10503,

2021 WL 4977514, at *4 (11th Cir. Oct. 26, 2021) (quoting Kisela

v. Hughes, 584 U.S. 100, 104 (2018)).[14]

---

[14] Given the fact-intensive nature of Fourth Amendment
reasonableness analysis, qualified immunity has a recursive,
Mobius strip-like quality: because every factual scenario is
different, it is hard to say when a case squarely governs the
issues presented by a new fact pattern.  See William Baude, Is
Qualified Immunity Unlawful?, 106 Calif. L. Rev. 45, 83 (2018)
("The more general the relevant precedents, the more obvious the
violation needs to be.  This framework makes it hard to find a
roadmap to the denial of immunity that could give a lower court
confidence in its conclusion.  Because the [Supreme] Court's
maps have nearly all been leading in the other direction, it
becomes harder for lower courts to recognize a violation of
clearly established law."); see also Jamison v. McClendon, 476
F. Supp. 3d 386, 405-06 (S.D. Miss. 2020) ("Federal judges now
spend an inordinate amount of time trying to discern whether the
law was clearly established 'beyond debate' at the time an
officer broke it.  But it is a fool's errand to ask people who
love to debate whether something is debatable.").  In the
Eleventh Circuit, fair warning may be provided by a materially
similar case from the Supreme Court, the Eleventh Circuit, or
the state's highest court; a broader, clearly established
principle drawn from the same sources; or constitutional words

To carry her burden on this issue, Atkins points to one Eleventh Circuit case declining to apply qualified immunity where the plaintiff was fatally shot after he resisted arrest and struck officers multiple times before "retreating, apparently unarmed, and outside of striking distance" when the shooting occurred, showing that even violence toward officers will not justify the use of deadly force when the suspect poses no immediate danger. Salvato v. Miley, 790 F.3d 1286, 1293-94 (11th Cir. 2015); Pl.'s Opp'n Bennett 13-14. Atkins cites another case for the proposition that the presence of a gun alone does not render deadly force reasonable, and further elaborates from this case law that the officer's purely subjective beliefs as to who was in danger are not just non-determinative but irrelevant, as Fourth Amendment reasonableness is an objective test. Pl.'s Opp'n Bennett 13-19; Perez, 809 F.3d at 1219-20. Atkins connects these rules to the rule recognized in Morton v. Kirkwood that deadly force is not per se justified to prevent the escape of all fleeing felony suspects, and that, more specifically, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." 707 F.3d 1276, 1283 (11th

_____

specific enough to clearly govern the issue presented. Vinyard v. Wilson, 311 F.3d 1340, 1350-52 (11th Cir. 2002).

[25]

Cir. 2013) (quoting Garner, 471 U.S. at 11 (referring, in context, to an unarmed, nonviolent felony suspect)); Pl.'s Opp'n Bennett 19-20.  Atkins also points to case law establishing that warning before using deadly force is generally required when feasible, and argues that such warning, which was not given here, was feasible under the circumstances.  Pl.'s Opp'n Bennett 14-17, 19; Salvato, 790 F.3d at 1293.  Finally, Atkins distinguishes the case on which Bennett most relies for his argument in favor of qualified immunity, DeBose v. City of Jacksonville, No. 3:09-cv-579, 2012 WL 13098640 (M.D. Fla. Feb. 7, 2012), on the grounds that that case involved an armed robbery suspect who also led police on a high-speed car chase before crashing the car, exiting it, and lifting up his shirt to reach for a dark object in an area with several bystanders -- and, thus, given the car chase and the presence of several onlookers, presented a more immediate threat to others' safety than Neal did here.  Pl.'s Opp'n Bennett 17-19; Def. Bennett's Mem. 17-20.

Atkins carries her burden to show that, viewing the facts in the light most favorable to her, Bennett's actions violated clearly established law.  As she argues, deadly force may not be used where no immediate threat is presented to the officers' or to others' safety, and, where no such threat is posed, a warning before using deadly force must be given.  See Morton, 707 F.3d

[26]

at 1283 (discussing Garner's application to car chase cases, and
stating the principle that "the use of deadly force against a
non-resisting [but fleeing] suspect who posed no danger violates
a suspect's Fourth Amendment right to be free from excessive
force"); Garner, 471 U.S. at 11-12 (stating that deadly force
may be used against a suspect who threatens serious physical
harm or who has committed a crime involving the infliction or
threat of such harm, "if necessary to prevent escape, and if,
where feasible, some warning has been given"); Pl.'s Opp'n
Bennett 14, 17.  The details of the cases on which Bennett
relies in fact support the proposition that these rules were
clearly established, because all of these cases involved a more
direct threat to safety than -- again, on the version of the
facts most favorable to Atkins -- Neal presented here.  See
Powell v. Snook, 25 F. 4th 912, 922-23 (11th Cir. 2022)
(applying qualified immunity where officer used deadly force
when confronted with armed homeowner "**raising his firearm in the
officer's direction**," and describing this as "the most critical
factual" distinction from cases finding unreasonable force
(emphasis added)); Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821
(11th Cir. 2010) (applying qualified immunity where officer used
deadly force when he "reasonably perceived the situation as an
**ambush**" based on fleeing armed suspect's having "suddenly
**confronted**" officer, with or without raising his weapon

[27]

(emphasis added)); Penley, 605 F.3d at 847-52 (applying
qualified immunity where officer used deadly force against
middle school student who had previously taken a hostage and
**"aimed"** apparent weapon at officers, and perhaps at bystanders,
from position in school bathroom (emphasis added)); Garczynski
v. Bradshaw, 573 F.3d 1158, 1168 (11th Cir. 2009) (applying
qualified immunity where officers used deadly force against
armed man in car who refused to drop weapon when asked and then
"**swung the gun** from his head **in the direction of the officers**"
(emphasis added)); Montoute, 114 F.3d 181, 184-85 (11th Cir.
1997) (applying qualified immunity where officer shot man armed
with sawed-off shotgun who had "**fired an illegal weapon in a
crowd of people in a near-riot situation**," passed officers with
gun pointed at ground, and refused orders to drop weapon
"specifically designed or altered, and frequently used, by
criminals to kill people"). These cases therefore support
Atkins' argument that, under clearly established law, Bennett
was not justified in shooting Neal if he did not present an
immediate danger to Bennett or to others at the time when he was
shot, and that simply possessing a gun is not enough to
establish immediate danger.

If Neal was not brandishing or aiming his weapon in a way
that threatened Bennett's safety or otherwise threatening
Bennett or others with immediate harm, then, qualified immunity

[28]

ought not apply to shield Bennett from liability. Given that the evidence does not establish what exactly Neal was doing in the moments before Bennett shot him, and thus whether his actions posed an immediate threat to Bennett or to others, this is as issue of material fact for the jury. As the Eleventh Circuit has noted, "the task of weighing the credibility of police testimony against other evidence 'is the stuff of which jury trials are made.'" Greer, 767 F. App'x at 712 (quoting Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013)).

## IV.  CONCLUSION

Atkins sued Sheriff Waters in his official capacity, and Officer Bennett individually, for, respectively, her son Neal's wrongful death under Florida law, and excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983, based on Neal's death when Bennett used deadly force against him while he was fleeing. Waters and Bennett moved for summary judgment on both counts.

This Court denies Waters and Bennett's motions for summary judgment, because there is a genuine issue of material fact as to whether Bennett reasonably believed himself or others to be in danger when he used deadly force without warning against Neal, and, as Bennett's employer, Waters and the City he

represents may be held vicariously liable for an employee's intentional tort if it was not maliciously done.

**SO ORDERED.**

WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[15]

_____

[15] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 47 years.